# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Milton I. Shadur | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 9098 | **DATE** | 12/18/2002 |
| **CASE TITLE** | Richard Tevlin vs. Metropolitan Water Reclamation | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1)  ☐  Filed motion of [ use listing in "Motion" box above.]

(2)  ☐  Brief in support of motion due _____.

(3)  ☐  Answer brief to motion due_____.  Reply to answer brief due_____.

(4)  ☐  Ruling/Hearing on _____ set for _____ at _____.

(5)  ☐  Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6)  ☐  Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7)  ☐  Trial[set for/re-set for] on _____ at _____.

(8)  ☐  [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9)  ☐  This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10)  ■  [Other docket entry]  Enter Memorandum Opinion and Order. For the reasons set forth in this memorandum opinion and order, both motion for summary judgment are denied. (10-1) This action is set for a status hearing at 9 a.m. January 10, 2003 to discuss the procedures and timetable needed to bring the matter on for trial.

(11)  ■  [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | DEC 19 2002 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | CM | |
| | Mail AO 450 form. | | docketing deputy initials | 23 |
| | Copy to judge/magistrate judge. | U.S. DISTRICT COURT | | |
| SN | courtroom deputy's initials | 02 DEC 18 PM 3:40 | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

**DOCKETED**

DEC 1 9 2002

RICHARD TEVLIN,                    )
                                   )
                Plaintiff,      )
                                   )
    v.                             )       No.  01 C 9098
                                   )
METROPOLITAN WATER RECLAMATION     )
DISTRICT OF GREATER CHICAGO,       )
                                   )
                Defendant.      )

## MEMORANDUM OPINION AND ORDER

Richard Tevlin ("Tevlin") has filed an action under Title
VII (42 U.S.C. §2000e to 2000e-17), charging Metropolitan Water
Reclamation District of Greater Chicago ("District") with race
discrimination.  Tevlin alleges that District failed to promote
him based on his race (white) and instead promoted a black
employee.

Tevlin filed a Fed. R. Civ. P. ("Rule") 56 summary judgment
motion, together with submissions in compliance with this
District Court's related LR 56.1.[1]  District has not only

---

[1]  LR 56.1 is designed to facilitate the resolution of Rule
56 motions by calling for evidentiary statements and responses to
such statements (in each instance with record citations), thus
highlighting the existence or nonexistence of factual disputes.
This opinion cites to Tevlin's LR 56.1(a)(3) statement as "T. St.
¶ -."  District's response to that statement is cited "D. Resp.
St. ¶ -," and its LR 56.1(b)(3)(B) statement of additional facts
is cited "D. Add. St. ¶ -."  Tevlin's response to D. Add. St. is
cited "T. Reply St. ¶ -."  Corresponding designations are used
for the submissions on District's motion.  Finally, this opinion
employs the same "T." and "D." abbreviations in referring to the
parties' exhibits ("Ex."), memoranda ("Mem."), answering
memoranda ("Ans. Mem.") and reply memoranda ("R. Mem.").

23

responded to that motion but has filed its own Rule 56 motion, also in compliance with LR 56.1. For the reasons set forth in this memorandum opinion and order, both motions are denied.

## Summary Judgment Standards

Familiar Rule 56 principles impose on parties moving for summary judgment the burden of establishing the lack of a genuine issue of material fact (_Celotex Corp. v. Catrett_, 477 U.S. 317, 322-23 (1986)). For that purpose this Court must "consider the evidentiary record in the light most favorable to the non-moving party...and draw all reasonable inferences in his favor" (_Lesch v. Crown Cork & Seal Co._, 282 F.3d 467, 471 (7th Cir. 2002)). And _Pugh v. City of Attica_, 259 F.3d 619, 625 (7th Cir. 2001) has echoed the teaching of _Anderson v. Liberty Lobby Inc._, 477 U.S. 242, 248 (1986):

> A genuine issue of triable fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

As with any summary judgment motion, this Court accepts each nonmovant's version of any disputed facts, but only so long as it is supported by record evidence. Where as here cross-motions are involved, the principles of Rule 56 thus demand a dual perspective -- one this Court has sometimes described as Janus-like--that sometimes causes the denial of both motions. That has unfortunately proved to be the case here. In any event, what follows in the _Facts_ section is culled from the parties'

2

submissions.

## Facts

District is a body politic organized under the laws of the State of Illinois (T. St. ¶3). Tevlin, a white employee of District, received a right to sue letter from the Equal Employment Opportunity Commission on his charge of discrimination against District, in which he asserted that he had been discriminated against on the basis of race when a black employee, Lucille Odoucha, ("Odoucha"), was promoted to an available Treatment Plant Operator III ("TPO III") position at District's Kirie Plant instead of Tevlin (T. St. ¶1).

Both Tevlin and Odoucha were Treatment Plant Operator IIs ("TPO IIs") at the time of the promotion in question. There are only two written requirements for promotion from a TPO II to a TPO III (T. App. Tab 8, Tab B at 2):[2]

---

[2] TPO III's additional job qualification requirements include "Graduation from high school or GED equivalent and seven years of experience in sewage treatment plant operations at a facility with a Class I designation by the Illinois Environmental Protection Agency" (T. App. Tab 8, Tab B at 2). Additionally, the job description continues (id.):

> Substitution: Full time study at an accredited college or university majoring in engineering or allied science be substituted for the required experience on a year-for-year basis to a maximum of four years. Completion of a comprehensive wastewater treatment plant operations course may be substituted for one year of the required experience. Possession of a Class IV certificate of competency in wastewater treatment works operations issued by the Illinois Environmental Protection Agency may be substituted for two years of the required education and experience.

3

One year of service with the District as a Treatment Plant Operator II. Civil service status as a Treatment Plant Operator II.

Any applicant for promotion to TPO III must also take a promotional exam, given in this instance on October 29, 1999 (D. Add. St. ¶5). Tevlin's adjusted score placed him in Category A ("Exceptionally Well Qualified")(D. Add. St. ¶6), while Odoucha's score placed her in Category B ("Well Qualified")(T. St. ¶19). After the promotional exam was scored and the TPO III Position became available at the Kirie Plant, fewer than five candidates had scored in Category A (D. Add. St. ¶7). According to District policy, when a promotional exam is given candidates are certified first from Category A, then from Category B and then from Category C ("Qualified") until at least five names have been certified (D. Add. St. ¶44). Because there were fewer than five candidates in Category A in this instance, candidates from Category B were also included and deemed "reachable" (D. Mem. 4).

All "reachable" candidates were then interviewed by a panel of District representatives, who graded the applicants' answers to questions (D. St. ¶23). Those scores were compiled in an interview matrix that was provided to District's General Superintendent John Farnan ("Farnan") for his approval of the appointment to the TPO III position (D. St. ¶23). Tevlin's average score on the interview matrix was 77.25 (D. Add. St. ¶8), while Odoucha's was 70.25 (D. Add. St. ¶9). Farnan testified

4

that scores within five to ten points of each other are within the same realm or same relative grouping (T. Ex. 6 at 34-35).

Tevlin and District disagree over other factors to be considered in the decisionmaking process. Tevlin argues that other factors such as tenure at the facility, disciplinary and service record, recommendations by supervisors/plant managers and the EEO recommendation should be considered (T. Mem. 8-9). District claims that the only factors that "need be considered under the District's statutorily mandated framework for promotions" are that the employee is "reachable" and whether the General Superintendent deemed an affirmative action appointment appropriate (D. Mem. 5). Moreover, District denies that any of the other factors proposed by Tevlin make Tevlin more qualified for the appointment than Odoucha (D. St. ¶36).

Tevlin had worked 17 years at the Kirie Plant (T. St. ¶21), while Odoucha had never worked there (T. St. ¶21). Although service at a particular plant is not required for promotion to the TPO III position at that plant (D. Add. St. ¶33, T. Reply St. ¶33), Tevlin argues that service at a particular plant is very important to the decision to promote to TPO III (T. R. Mem. 2-3).

Tevlin's service ratings as a TPO II had always been "Exceeds Standards," and he had never been disciplined (T. St. ¶22). Odoucha's service rating as a TPO II was "Meets Standards" (T. Ex. 8D), and she had received a written warning while working

as a TPO II (D. St. ¶¶22, 23). Discipline does not automatically disqualify a candidate from being promoted to a TPO III (D. Add. St. ¶52), but Tevlin argues that her disciplinary warnings should be a factor against the promotion of Odoucha (T. Mem. 8).

William Munch ("Munch") is the Assistant Chief Engineer in the Maintenance and Operations Department (D. St. ¶15). Munch recommended Tevlin rather than Odoucha for the TPO III position at Kirie (T. St. ¶23). Lee Rakowski was the Plant Manager at Kirie, and he too recommended Tevlin for the TPO III position at Kirie (T. St. ¶29). Under District rules the "final selection [for a promotion] is the responsibility of the various department heads with the approval of the general superintendent [Farnan]" (T. St. ¶31).

District has a voluntary affirmative action plan ("Plan") established in 1974 (D. Add. St. ¶12). District's Plan provides the basis under which the Personnel Department reviews appointment opportunities to determine whether or not to make an EEO recommendation for a minority appointment (D. St. ¶12). Any such EEO recommendation is governed by the Plan's language that "where the staff has an unrepresentative mix of minorities and women, merit factors being equal, special attention should be given to this matter when a vacancy is to be filled" (D. St. ¶13). As written, the Plan does not require a permanent racial balance or a quota (T. Reply St. ¶14).

According to EEO officer Frances Wilkins ("Wilkins"), "merit factors being equal" means that a vacancy may be filled with a minority or female employee "so long as that person is qualified for the appointment in accordance with the statutory requirements imposed upon the District" (D. Add. St. ¶15), which means that anyone who has passed the promotional exam and is "reachable" has equal merit factors. In contrast, Director of Personnel Matthew Menze believes that candidates with widely disparate scores, for example 100 and 80, would not be considered to have equal merit factors even if they were both eligible to be interviewed (T. St. ¶47).

Whenever there is an opportunity for a promotion or new hire, Wilkins reviews the percentage of minority employees in a particular job class, referred to as "external availability," and compares that with the number of minorities in the current job position (T. Ex. 7 at 34). To determine external availability, District uses the 1990 census data of Treatment Plant Operators (D. St. ¶20), a categorization that does not differentiate among individuals who are qualified to be in the various District categories of TPO I, II or III (D. St. ¶38,40). External availability as taken from the 1990 census is an approved utilization factor according to guidelines from the Office of Federal Contract Compliance Guidelines (D. St. ¶29). Another approved utilization factor is "internal availability": the

number of minority employees able to be promoted to the classification at issue in a specific instance (D. St. ¶29). Only if the percentages show an underrepresentation of minority employees in the job classification will an EEO recommendation for a minority appointment be made (D. St. ¶20). And if there is no reachable minority candidate who survived the promotional examination process, no EEO recommendation for a minority appointment is made (D. St. ¶21).

For the TPO III position at the Kirie plant, Wilkins prepared an EEO analysis that recommended a minority appointment (D. St. ¶27). At the time of the vacancy, the minority population in the TPO III classification was 10% (D. St. ¶33), the "external availability" was 27% and the "internal availability" was 8% (D. St. ¶33). Minority representation on the promotion list--one of nine who had passed the promotion exam and were thus "reachable"--came to 11% (D. St. ¶33). Wilkins determined that an EEO recommendation for a minority appointment was necessary because the "external availability" taken from the 1990 census was greater than the minority population in the TPO III category at the time of the vacancy (T. St. ¶39). Indeed, Wilkins testified that she would make such an EEO recommendation even if the current minority population of the TPO III category were 26% and the external availability were 27% (T. St. ¶41).

In making his decision, Farnan reviewed the interview matrix

scores, the EEO recommendation, the Department recommendation and the candidates' comparative lengths of tenure (D. St. ¶38,39). Farnan determined that Odoucha "was appropriate for the position and would be able to fulfill the duties of a TPO III [and that] the difference in interview matrix scores between [Odoucha] and [Tevlin] was not of a difference substantial enough to disregard the EEO recommendation" (D. St. ¶41). Even though Farnan is not required to follow the EEO recommendation in making his appointment decision (T. St. ¶43), he expressly acknowledged that it was "more than likely" that he would have appointed Tevlin but for the EEO recommendation (D. Resp. St. ¶48).

### Substantive Standards[3]

At issue in this case is whether District's promotion of Odoucha instead of Tevlin was a violation of anti-discrimination principles under Title VII. Title VII protects both minority and nonminority employees from discrimination (Mills v. Health Care Serv. Corp., 171 F.3d 450, 454-55 (7th Cir. 1999)). To prove "reverse discrimination," Tevlin may either rely on direct evidence or use indirect evidence to show that there is a

---

[3]     In the summary judgment context a movant's burden is only that of creating reasonable inferences, not one of proof as such. But any repeated use of that terminology involves an awkward locution, an awkwardness contributed to by the fact that so much of the caselaw speaks of what a plaintiff must "prove" or "show." Accordingly, whenever this opinion employs such terms it should be understood as meaning a movant's lesser burden of creating reasonable inferences, not his or its actually bearing the burden of persuasion. That inference-creating burden is the test that this Court has in fact used throughout this opinion.

reasonable probability that the employment action was taken because of his race (id. at 456). Because Tevlin has not provided any direct evidence of discrimination, his claim and District's opposition must be analyzed under the indirect evidence standard. In this instance that involves testing District's affirmative action plan and its implementation under an appropriate variation of the familiar McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973) principles.

Under the McDonnell Douglas approach in its original form, an employee must first establish a prima facie case showing that (1) the employee is a member of a protected class; (2) the employee applied and was qualified for an open position; (3) the employee was rejected; and (4) the employer filled the position with a person not in employee's protected class. Tevlin easily fulfills the latter three elements: He applied for, and was qualified for, the TPO III position at the Kirie plant (T. St. ¶18); he did not get the position (T. St. ¶33); and District filled the TPO III position with Odoucha, who is black and is thus not in the same racial category as Tevlin, who is white (D. St. ¶1).

When the first element in the McDonnell Douglas formulation is sought to be applied to a claim of reverse discrimination (employer action taken in favor of, rather than against, a member of a protected class), a different articulation is obviously

called for: In that circumstance an employee such as Tevlin may

show, not that he is a member of a protected class (he is not),

but rather at least one background circumstance that gives rise

to an inference of discrimination (Mills, 171 F.3d at 455). Such

background circumstances could include a showing that the

employee is clearly more qualified than the person ultimately

hired or a showing that the employer expressed intense interest

in hiring a person from a protected class (id.). And Mills, id.

at 457 observed that establishing such background circumstances

"is not to be interpreted in a constricting fashion." Hence this

opinion will first address the question of whether there were

sufficient background circumstances to meet the first element of

the McDonnell Douglas test as so modified.

As stated earlier, District's Rule 56 motion calls for

examination of the evidence in a light most favorable to

nonmovant Tevlin. From that perspective Tevlin plainly meets the

"background circumstances" requirement. Surely the combination

of his higher ("Exceptionally Well Qualified") promotional

examination score, his superior disciplinary and service records,

his 10% higher interview matrix score and his substantially

greater level of experience[4] could fairly be viewed as making him

significantly more qualified than Odoucha (indeed, that may be an

---

[4] Tevlin had worked for a total of 17 years at the Kirie
Plant, including 15 years as a TPO II By contrast, Odoucha had
never worked at the Kirie plant and had less than two years
experience as a TPO II (T. St. ¶21).

understatement). Thus Tevlin has clearly provided a prima facie case, enabling him to proceed to the next step of the McDonnell Douglas analysis.

On Tevlin's Rule 56 motion, however, the facts must be viewed through a different lens--one reasonably favorable to District. In that light, each of Tevlin's claims that he was clearly more qualified than Odoucha is sought to be met by District's advancement of other contentions. As District would have it:

1. Once the initial promotional examination scores are ranked, leaving fewer than five applicants in the top-ranked category, all applicants in the next category (Category B) are considered reachable and are therefore interviewed (D. St. ¶7). And once that new group of applicants in Category A and B has been formed, Wilkins testified that all applicants are considered to be equally qualified (D. St. ¶14).

2. As for Tevlin's superior interview matrix score, District points to the closeness of the two scores as placing Odoucha and Tevlin within the same realm or relative grouping (T. Ex. 6 at 34-35).

3. As to Tevlin's admittedly superior disciplinary record, Odoucha's reprimand would not disqualify her from being promoted (T. Reply St. ¶52).

12

4.  Tevlin's reliance on his years at the Kirie plant
    and longer experience as a TPO II is met by his
    acknowledgment that no set level of experience is required
    for promotion (T. Resp. St. ¶14, 33; see also O'Connor Dep.;
    Tab K ¶4).

This is not of course the occasion for a judicial weighing of the
evidence--but any reasonable look at those matters reveals that
they bear only on Odoucha's eligibility to be considered, rather
than on the comparative evaluation itself.  In that latter
respect it cannot fairly be said that Tevlin failed the prima
facie requirement of being "clearly more qualified" in Mills
terms.[5]

    But even were that not so, Mills, 171 F.3d at 457 (internal
quotation marks omitted) identifies still another variant on the
first element of the prima facie McDonnell Douglas test that is
available to Tevlin:  if he can "establish[ ] a logical reason to
believe that the [employer's] decision rests on a legally
forbidden ground, such as his race...."  That alternative draws
upon the teaching of Carson v. Bethlehem Steel Corp., 82 F.3d
157, 158 (7th Cir. 1996)(per curiam):

    The central question in any employment-discrimination
    case is whether the employer would have taken the same
    action had the employee been of a different race...and

───────────────
    [5]  That makes it unnecessary to examine the other Mills-
specified alternative of District's having expressed an "intense
interest" in hiring someone from a protected class, such as
Odoucha.

                            13

everything else had remained the same.

Here District expressly acknowledges that Farnan took the EEO recommendation for a minority appointment into account in making the TPO III promotion decision (D. St. ¶38). Although other factors were considered, Farnan admitted that if there had been no EEO recommendation, he would most likely have approved Tevlin's promotion (D. St. ¶34). In turn, the EEO recommendation focused on Odoucha as a recommended candidate only because of her race--black (D. St. ¶39). So even in a light most favorable to District, its employment decision as exemplified by Farnan's reliance on the EEO recommendation was directly at odds with the <u>Carson</u> teaching carried forward in <u>Mills</u>. On not just one but two grounds, then, Tevlin has established a prima facie case for purposes of his Rule 56 motion as well.

Once an employee has surmounted the prima facie hurdle, the burden shifts to the employer to articulate a nondiscriminatory rationale for its decision (<u>Johnson v. Transp. Agency</u>, 480 U.S. 616, 626 (1987)). And <u>Johnson</u>, <u>id</u>. holds that the existence of a remedial affirmative action plan provides such a rationale in cases where discrimination has occurred in the past. If such an affirmative action plan is asserted as a basis for the employer's decision, it is plaintiff's burden[6] to prove that the employer's

---

[6] Some cases, such as <u>Bass v. Bd. of County Comm'rs</u>, 256 F.3d 1095, 1114-15 (11th Cir. 2001) and <u>Hill v. Ross</u>, 183 F.3d 586, 590 (7th Cir. 1999), have questioned the continued validity of placing the burden on plaintiffs such as Tevlin in these types

14

justification is pretextual or that the plan is invalid (<u>id</u>. at 626-27).

In that respect Tevlin Mem. 3 argues that District's reliance on the affirmative action plan is a pretext for racial discrimination. But he proffers no evidence that District's reference to the affirmative action plan is "a lie, specifically a phony reason for some action" (<u>Russell v. Acme-Evans Co.</u>, 51 F.3d 64, 68 (7th Cir. 1995)) or a "deceit used to cover one's tracks" (<u>Clay v. Holy Cross Hosp.</u>, 253 F.3d 1000, 1005 (7th Cir. 2001)). Hence this opinion will treat Tevlin's challenge to the affirmative action plan as a dispute over its validity.

Again the cross-motion posture of the case compels a two-way look. To prevail on his own Rule 56 motion, Tevlin must actually prove the Plan invalid.[7] By contrast, for District to prevail on its Rule 56 motion, it must demonstrate Tevlin's failure to create a factual dispute as to the validity of the Plan. Neither side succeeds in those terms.[8]

---

of cases. But <u>Bass</u> found itself bound by the clear Supreme Court precedent in <u>Johnson</u> that placed the burden in Title VII cases on plaintiff, and <u>Hill</u> was decided without fully addressing the question. This Court perforce leaves the burden with Tevlin.

[7] Tevlin's attempted reliance on <u>Hill v. Ross</u> (see n.6) throughout his memoranda fails to consider the procedural posture of that case: the appellate review of a summary judgment in favor of the <u>defendant</u>.

[8] This opinion is being written before the Supreme Court has had the opportunity to address the subject of affirmative action plans in a different context (<u>Grutter v. Bollinger</u>, No. 02-241, cert. granted to review the decision reported at 288 F.3d

15

All racial classifications by government actors, whether benign or invidious, are subject to strict scrutiny review (<u>Adarand Constructors, Inc. v. Pena</u>, 515 U.S. 200, 227 (1995)). And the caselaw has spoken of more than one possible justification that can survive such review.

One such potential justification is that the racial classification is necessary to remedy the governmental entity's unlawful past discrimination (<u>McNamara v. City of Chicago</u>, 138 F.3d 1219, 1222 (7th Cir. 1998)). On that score, the question whether an actual finding of prior discrimination is a precondition to such a showing is unsettled in this Circuit. On the one hand, several Supreme Court opinions of nearly a generation ago rejected the need for an employer to acknowledge such past discrimination before implementing a voluntary affirmative action plan (see, e.g., <u>Johnson</u>, 480 U.S. at 630 n.8; <u>Wygant v. Jackson Bd. of Educ.</u>, 476 U.S. 267, 290-92 (1986)(O'Connor, J., concurring); <u>United Steelworkers of America v. Weber</u>, 443 U.S. 193, 210-11 (1979)(Blackmun, J., concurring)). But those expressions are in substantial tension with what our Court of Appeals has said in <u>Hill v. Ross</u>, 183 F.3d 586, 590 (7th Cir. 1999):

---

732 (6th Cir. 2002)). Even though the <u>Grutter</u> opinion might well cast light on the issues here, for now this opinion must look to the existing caselaw. But because denial of the current motions keeps the case alive, this Court will have the opportunity to revisit the issue once <u>Grutter</u> comes down.

16

> An employer that wants to use sex (race, religion, etc.) as a factor in hiring decisions and yet denies ever engaging in discrimination (and therefore denies that a remedy is in order) must supply some other "exceedingly persuasive justification" [besides remedying discrimination].

But for the reason explained a bit farther on, this Court is not called on to attempt a reconciliation of those different signals.

Still another arguable justification for affirmative action plans may perhaps be found in non-remedial factors, such as public safety concerns (see, e.g., <u>Wittmer v. Peters</u>, 87 F.3d 916 (7th Cir. 1996)). But District has not chosen to rest the validity of the Plan on any of the concerns discussed above. It relies instead on the <u>Johnson</u> holding that voluntary affirmative action plans may be justified for Title VII purposes by a showing that a manifest imbalance exists, reflecting underrepresentation of minorities in traditionally segregated job categories (<u>Johnson</u>, 480 U.S. at 631-32).

In those terms the success of District's Rule 56 motion hinges on Tevlin's inability to create a factual dispute as to the validity of the Plan. And as the ensuing discussion reflects, Tevlin has raised material issues of fact about such validity sufficient to block District's motion.

In that respect District has failed to present any statistical and related evidence of a disparity between external availability and the current minority population such that a jury could conclude that the disparity must have resulted from

17

discriminatory exclusion.  District has shown an external
available pool of 27% minority population in the Treatment Plant
Operator category in the 1990 census (D. St. ¶30, 33), while at
the time of the promotion only 10% of the TPO IIIs employed by
District were minorities (D. St. ¶33).  But even if it were
assumed that the census category is the relevant labor pool (more
on this subject later), such a differential could have arisen
naturally from portions of the minority population choosing not
to pursue the TPO III job[9] or from societal discrimination that
prevents minorities from acquiring the education needed for the
TPO III position.[10]  With all reasonable inferences taken in
Tevlin's favor, District's mere recitation of current statistics
does not suffice to create an inference of discriminatory
exclusion essential to a remedial affirmative action plan.[11]

District's motion also fails because, again with Tevlin
getting the required benefit of favorable inferences, District
has focused on the wrong labor pool in making its comparisons
(see, e.g., Janowiak v. City of South Bend, 836 F.2d 1034, 1041-

---

[9]  Cf. Middleton v. City of Flint, 92 F.3d 396, 407 (6th
Cir. 1996), discussing the disproportionate ownership of hotel
lodgings by persons whose origin is the Indian subcontinent.

[10]  As succinctly put in the plurality opinion in Wygant,
476 U.S. at 276:

Societal discrimination, without more, is too amorphous
a basis for imposing a racially classified remedy.

[11]  See Appendix.

42 (7th Cir. 1987)). On that score <u>City of Richmond v. J.A. Croson Co.</u>, 488 U.S.469, 501-02 (1989) teaches that "where special qualifications are necessary, the relevant statistical pool for purpose of demonstrating discriminatory exclusion must be the number of minorities qualified to undertake the particular task."

For that purpose District has pointed only to the 1990 census (the most recent available at the time of decision) and to its category of treatment plant operators (D. St. ¶ 30). But District concedes that the 1990 census does not differentiate among the various TPO levels (I, II and III)(D. Add. St. ¶31), and it has tendered no evidence as to whether the 1990 census population of TPOs mirrors the make-up of those eligible to be a TPO III.

District lamely argues that "<u>it may be</u> that every person in the external workforce [identified by the census] would be qualified for the TPO III position" (D. Add. St. ¶31, emphasis added). But the admittedly hypothetical nature of that proposition destroys District, for the more demanding requirements of the TPO III job could just as well cause only a percentage of those in the TPO census category--perhaps no more than a third (yielding a 9% relevant labor pool)--to be qualified for the TPO III position.[12] What has just been hypothesized is

_____

[12] If that were so, the relevant labor pool would fall below the 10% minority population currently in the TPO III

19

admittedly speculative (though it is surely more than a reasonable possibility), but the critical fact is that District's hypothesis is not only less probable in real world terms but, more importantly, is also speculative. And such speculation cuts against District on its own motion. Given the direction in which inferences must be drawn, the Plan lacks the requisite support to be found valid as a matter of law.

But on the flip side of the summary judgment record,[13] Tevlin's motion also loses because the evidence, when taken in the light most favorable to District, does not show the Plan to be invalid. According to <u>Johnson</u>, 480 U.S. at 627 Tevlin bears that burden, either by showing that the Plan is not remedial or (<u>id</u>. at 626) that it unnecessarily trammels the rights of non-minorities.

This time the need to speculate cuts against Tevlin, for the imbalance of current TPO III positions (10% minority) in relation to the external availability (27%) (D. St. ¶33) could in fact be an indicator of prior discrimination that District is trying to correct through the Plan. Here it cannot be said as a matter of law that District's Plan did not have a remedial purpose. Absent

category. Even under the generous Plan formulation as stated by Wilkins, she would not then have been empowered to issue an EPO recommendation of a minority hire.

[13] To be sure, CDs do not have flip sides. But the need for an apt analogy may justify a reference to yesteryear's less sophisticated technology.

any other evidence on the subject, a jury <u>could</u> conclude that the entire census category of Treatment Plant Operator could serve as TPO IIIs and that the consequent disparity between that population and the fact that only 10% of the current TPO III positions are minority-occupied implies a history of discrimination that deterred or prevented minority employees from reaching the TPO III position.[14] That resulting inference is supplemented by the stated purpose of the Plan: "to identify and deal with discrimination and roadblocks to equal opportunity, intended or unintended" (D. Ex. F at 1).

To be sure, a reasonable jury could draw other inferences from those facts, as Tevlin would prefer and as this opinion has already said. But from the required Rule 56 perspective granting favorable inferences to nonmovant District, the hypothesized disparity and Plan's stated purpose would suffice to enable a reasonable jury to conclude that there was historical discrimination and that the Plan was created to remedy that discrimination.

Tevlin also contends that his rights were unduly trammeled (the alternative showing under <u>Johnson</u>) when District promoted Odoucha instead of him. On that issue a court must consider

_____

[14] Farnan declared that he believed that there was no race discrimination by the District as to the TPO III or the TPO II positions (D. Ex. E at 37-38). But as stated earlier, this opinion need not decide whether a finding of intentional discrimination is necessary.

whether a plan absolutely bars whites from employment, whether white workers are discharged because of the plan, and whether the plan is intended to last only until the company can achieve racial balance (<u>Steelworkers v. Weber</u>, 443 U.S. at 208).

Once more taken in the light most favorable to District, the Plan may be considered valid because it provides for "special attention" to minority candidates only when "merit factors are equal" (D. St. ¶13). It does not mandate that Farnan make a minority appointment whenever an EEO recommendation for such an appointment is made. Farnan does take the EEO recommendation into consideration, but he is not obligated to match the current employment percentage to the external availability (T. St. ¶43).

As for the other <u>Steelworkers v. Weber</u> factors, no white employees lost their jobs--instead they simply had possible promotions delayed. Tevlin admits that he is eligible for a TPO III position at another plant (D. Ex. H at 28).[15] Finally, the Plan does not <u>require</u> recommendations for a minority appointment if the external availability overmatches the internal population (D. St. ¶20), so that the Plan could be seeking only to undo the manifest racial imbalance. Such modest steps allow for

---

[15] Although Tevlin claims that his chances for promotion have been significantly diminished because future TPO III openings are unlikely to be at the Kirie Plant (D. Ex. H at 28-29), once again the Rule 56 inference rule would permit a reasonable jury to conclude that Tevlin has significant opportunities for promotion to TPO III despite his concerns over location.

incremental improvements that provide for a moderate and flexible case-by-case approach to "eliminat[e] the vestiges of discrimination in the workplace" (Johnson, 480 U.S. at 642).

But having said all of that, this Court is constrained to observe that every conceivable merit factor favors Tevlin over Odoucha. Only a few decisions have been turned up in which our Court of Appeals has upheld affirmative action by a governmental entity that has promoted inferior candidates over others having obviously better credentials (see, e.g., Reynolds v. City of Chicago, 296 F.3d 524 (7th Cir. 2002); Majeske v. City of Chicago, 218 F.3d 816 (7th Cir. 2000)). And in both of the cited cases, juries had made findings of explicit and pervasive earlier discrimination by the governmental entity (Reynolds, 296 F.3d at 527-30; Majeske, 218 F.3d at 821-22). Moreover, neither of those cases involved a situation in which there were so many elements of objective superiority favoring the rejected candidate, with the preferred employee having only one characteristic--the color of her skin--to "justify" her being chosen.

This Court has long believed that affirmative action can play an important role in our society. But in this instance Judge Easterbrook's opinion in Hill, 183 F.3d at 592 could readily have been written for this case by a simple substitution of the litigants' names:

> Perhaps the [District] can offer more in defense of its
> decision, now that it knows where the burden lies. On

23

> this record, however, [Tevlin] comes closer than does
> the [District] to establishing entitlement to victory.

If District is to prevail at trial, it will have to make a showing that that justifies the use of affirmative action to override the substantial objective superiority of Tevlin as a candidate for the TPO III position.

## Conclusion

This case has unfortunately returned to square one, the consequence of the dual stance mandated to deal with cross-motions for summary judgment. Here the presence of genuine issues of material fact defeats both motions. This action is therefore set for a status hearing at 9 a.m. January 10, 2003 to discuss the procedures and timetable needed to bring the matter on for trial.

Milton I. Shadur
Senior United States District Judge

Date: December 18, 2002

District's Plan, self-described as an effort to correct a perceived unrepresentative minority job complement, seems to set as its aim a one-to-one correlation between the minority population at District and the external availability. That is the obvious message conveyed by Wilkins' position that she will issue an EEO recommendation for a minority appointment whenever the external availability exceeds the internal population at all (T. St. ¶41).

But that approach appears to exemplify the classic distinction between general goals (permissible) and specific quotas (impermissible). That is, the law allows a remedial affirmative action plan not to create an exact match, but only to serve as a corrective measure when the low percentage of minority employees in a particular job category cannot be accounted for as a reasonably expected result from a random distribution of employees.

Castaneda v. Partida, 430 U.S. 482, 496 n. 17 (1977) is the seminal case that has explained the significance of such statistical disparities by the calculation of the number of "standard deviations" as a measure of predicted fluctuations from the expected value of a sample. Generally two standard deviations mark the watershed: They represent an approximate 95% level of confidence in (or on the obverse side of the coin, a 5% level of disparity from) what might be expected from a random

distribution. In the judicial arena the two-standard-deviations figure has gained a special degree of credibility since its appearance in <u>Castaneda</u> and in <u>Hazelwood Sch. Dist. v. United States</u>, 433 U.S. 299, 308 (1977).

Because this opinion has not found it necessary to address the Plan's validity from that perspective, no definitive ruling on the subject is made or implied here. But it is surprising, to say the least, that in this instance District's counsel have not at all addressed the issues of the specific statistical significance (and the number of standard deviations) represented by the disparity between 27% external availability and 10% internal population.